**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**JOSE MARIA BAROCIO SANCHEZ,**

Petitioner,

v.

**ERIN REYES,**

Respondent.

Case No. 2:24-cv-02150-IM

**OPINION AND ORDER**

**IMMERGUT, District Judge.**

Petitioner Jose Maria Barocio Sanchez ("Petitioner"), an individual in custody at Two Rivers Correctional Institution, filed this habeas corpus proceeding pursuant to 28 U.S.C. § 2254. Because Petitioner's habeas petition is barred by the applicable one-year statute of limitations, and because Petitioner does not establish that any exception applies to overcome the untimeliness, this Court denies the Petition for Writ of Habeas Corpus (ECF No. 2) and denies a certificate of appealability.

**BACKGROUND**

In September 2014, a Marion County grand jury returned an indictment charging Petitioner with Sexual Abuse in the First Degree and Sodomy in the First Degree. (Resp't Ex. 104, ECF No. 12.) The charges arose out of Petitioner's conduct toward his niece "YR," a child under fourteen years of age, sometime between July 6, 2005, and July 5, 2010. (*Id.*) The grand jury issued a second indictment in October 2014, charging Petitioner with one count each of Sexual Abuse in the First Degree, Sodomy in the Second Degree, and Unlawful Sexual Penetration in the Second Degree. (Resp't Ex. 105.) The additional charges arose out of Petitioner's conduct toward YR's sister, "ER," a child under fourteen years of age, sometime between January 1, 2002, and December 31, 2002. (*Id.*)

In June 2015, Petitioner proceeded to a consolidated trial before a jury. (*See* Resp't Ex. 107.) YR and ER both testified at trial about discrete instances of sexual abuse involving their uncle, Petitioner, who was part of their large extended family.

YR, who was sixteen at the time of trial, testified that when she was six years old, she often played with her cousins at Petitioner's apartment. (*Id.* at 121-22.) YR testified that during some of her visits, Petitioner would take her to his bedroom, "touch[] [her] in places," and "have oral sex with [her]." (*Id.* at 123-24.) Although YR could not recall how many times this happened, she described in detail three specific instances of abuse. (*Id.* at 134.)

First, YR testified that one night after everyone had gone to bed, she was on the couch with Petitioner when he pulled a large blanket over them, grabbed her hand, and made her stroke his penis. (*Id.* at 124-25.) YR recalled that later that night, Petitioner engaged in sexual activity with her aunt, Maria Mendoza-Espinoza ("Mendoza-Espinoza"), while YR was sleeping in the

same bed, and that Mendoza-Espinoza refused to take her home even though she was upset. (*Id.* at 125-26.)

YR then testified that Petitioner once approached her while she was playing hide and seek with her cousin, and that Petitioner "had oral sex again with [her] but this time it was anally." (*Id.* at 131.) YR testified that this episode stood out because it was the only time Petitioner touched her rectum. (*Id.* at 132.)

Finally, YR testified that on another occasion, Petitioner took her to his bedroom, had oral sex with her, and then got on top of her. (*Id.* 133-34.) YR recalled that Petitioner had removed her "Dora the Explorer" underwear and it had "hurt really bad" when he was on top of her. (*Id.*) YR testified that the abuse did not stop until she was about ten years old, and that her aunt "never once checked up on [her]" while she was in Petitioner's home. (*Id.* at 134-35.)

ER, who was twenty-three at the time of trial, testified that she spent the night at Petitioner's apartment on one occasion when she was eleven or twelve years old. (*Id.* at 150-52.) ER recalled that while everyone else was asleep, Petitioner approached her, showed her pornography, and inserted his finger in her vagina. (*Id.*) ER testified that Petitioner also placed his mouth on her vagina in a walk-in closet in her family's home around the same time. (*Id.* at 165.)

ER then described in detail several instances of abuse that occurred while she was helping Petitioner clean offices to earn money. (*Id.* at 153.) Although Mendoza-Espinoza usually cleaned with Petitioner, ER filled in after Mendoza-Espinoza gave birth. ER recalled that while helping Petitioner clean a scrapbooking store on the outskirts of Silverton, Petitioner took her pants off, started "grinding" on her, and placed his mouth on her vagina. (*Id.* at 155-56.) ER also recalled that while helping Petitioner clean an autobody shop in Woodburn, Petitioner took her

pants off and rubbed his penis on the outside of her vagina. (*Id.* at 157-59.) Finally, ER recalled that while helping Petitioner clean a dentist's office in Lake Oswego, Petitioner took her into the break room, "examine[d]" her vagina, and attempted to have sexual intercourse with her, without success. (*Id.* 160-62.)

Neither YR nor ER disclosed the abuse to anyone, including each other, because they were afraid they would not be believed. (*Id.* at 135-36, 163.) YR ultimately confided in her brother's fiancé in May 2014, who reported the disclosure to YR's brother. (*Id.* at 139-42.) YR's brother then told their parents, who contacted the police. (*Id.* at 134.) Upon learning about YR's disclosure, ER disclosed that she also had suffered Petitioner's abuse. (*Id.* at 165-66.)

Several extended family members testified in Petitioner's defense. They testified, among other things, that Petitioner was helpful and hardworking, and maintained "wholesome" relationships with children. (*See* Resp't Ex. 108 at 42, 45, 51-52, 61, 72.) The extended family members also testified that YR and ER never said anything indicative of abuse prior to their disclosures, that their mother did not allow them to sleep over at other people's houses, and that in 2006, YR and ER's immediate family had a "falling out" with the rest of the extended family based on sexual abuse allegations that did not involve Petitioner. (*Id.* at 44-47, 53, 62, 65-66, 73.)

Mendoza-Espinoza also testified in Petitioner's defense. (*Id.* at 79.) During her testimony, Mendoza-Espinoza acknowledged that Petitioner regularly cleaned different buildings to earn money but denied that ER had ever accompanied him to clean. (*Id.* at 81-82.) Mendoza-Espinoza also confirmed that YR had come over to spend the night on one occasion but had spent the night on the couch with Mendoza-Espinoza and never shared the couch with Petitioner. (*Id.* at 83.) Mendoza-Espinoza insisted that she always kept a close eye on the children, never

saw any "unusual activity" involving Petitioner, and never left any of the children alone with Petitioner because she "was always there." (*Id.* at 84-85.) Although Mendoza-Espinoza confirmed on cross-examination that Petitioner had cleaned a dental office in Lake Oswego, an autobody shop in Woodburn, and a "card place" in Silverton, she insisted that she had accompanied Petitioner each time he serviced those businesses. (*Id.* at 87-89.)

Finally, Petitioner testified on his own behalf and denied having any sexual contact with YR or ER. (*Id.* at 112-115.) Although Petitioner insisted that he was never alone with either victim, the jury returned unanimous guilty verdicts on all counts. (*Id.* at 161-62.) Based on the aggravating circumstances of Petitioner's crimes, the trial court sentenced Petitioner to a term of imprisonment totaling 525 months. (*Id.* at 168-69; Resp't Ex. 102.)

Petitioner filed a direct appeal raising three assignments of error that are not relevant to the instant proceeding. (Resp't Ex. 113.) The Oregon Court of Appeals affirmed without opinion, *State v. Barocio-Sanchez*, 287 Or. App. 887, 403 P.3d 815 (2017), and on February 1, 2018, the Oregon Supreme Court denied review, *State v. Barocio-Sanchez*, 362 Or. 482, 412 P.3d 201 (2018).

On October 15, 2020, Petitioner filed a petition for postconviction relief ("PCR"). (Resp't Ex. 119.) In his counseled, second amended PCR petition,[1] Petitioner asserted that his trial

---

[1] In his first amended PCR petition, Petitioner asserted that his trial attorney was ineffective when he failed to question the victims about their living arrangements and physical relationship with Petitioner, failed to question a state witness about Petitioner's living arrangements, and failed to question YR about where the alleged abuse occurred and a motion detection light Petitioner installed to prevent YR from sneaking out of the house. (Resp't Ex. 120 at 3-5. [1]) Defendant moved for summary judgment, arguing that Petitioner failed to present sufficient, admissible evidence to create a genuine issue of material fact with respect to any claim alleged in the amended PCR petition. (Resp't Ex. 122.) Petitioner filed the second amended PCR petition in response, and Defendant moved to withdraw the motion for summary judgment. (Resp't Ex. 126.)

attorney was ineffective when he "failed to properly or timely file a motion to introduce evidence of prior sexual conduct of the victims[.]" (Resp't Ex. 124 at 3-4.) After an evidentiary hearing, the PCR court concluded that the petition was untimely and lacked merit. (*See* Resp't Exs. 137, 138.) The PCR court thus denied relief. (*Id.*)

Petitioner appealed, assigning as error the PCR court's rejection of his PCR petition as time-barred and without merit. (Resp't Ex. 140 at 2-3.) Defendant moved for summary affirmance, arguing that based on the PCR court's adverse factual findings, "no evidence in the record supports a finding that petitioner could not reasonably have raised his claims within the statute of limitations[.]" (Resp't Ex. 141 at 3.) The Appellate Commissioner initially denied the motion, but the Oregon Court of Appeals summarily affirmed upon reconsideration. (Resp't Exs. 144-146.) On October 3, 2024, the Oregon Supreme Court denied review (Resp't Ex. 148).

On December 27, 2024,[2] Petitioner filed his federal habeas petition, asserting a single ground for relief:

> Petitioner alleges that he was deprived of his Sixth Amendment [r]ight to effective assistance of trial counsel and [i]neffective assistance of appellate counsel governed by the Fourteenth Amendment right to due process. Trial Counsel violated the Petitioner's Sixth Amendment of the United States Constitution by providing ineffective assistance and failed to provide sound tactical advise that Trial Counsel should have known would cause the Petitioner to become exposed to [p]rosecutorial advantages that caused Petitioner to schemes [sic] that were basically handed to him through counsel where the trial proceedings lost the mandatory confrontational element between the state and the petitioner which ultimately caused the Petitioner to lose crucial leverage the Petitioner had but then lost his ability to martial a defense.

---

[2] December 27, 2024, is the date on which Petitioner signed the Petition and handed it to prison officials for mailing. *See Campbell v. Henry*, 614 F.3d 1056, 1058-59 (9th Cir. 2010) (explaining that under the mailbox rule, a *pro se* habeas petition "is deemed filed when [and individual in custody] hand[s] it over to prison authorities for mailing to the relevant court" (quotations and citations omitted)).

(Pet. at 5.) Respondent urges this Court to deny habeas relief because Petitioner failed timely to file the petition. (Resp. to Pet. at 3-4, ECF No. 10.) Respondent further asserts, in the alternative, that Petitioner's sole ground for relief is procedurally defaulted. (*Id.* at 4-5.)

## DISCUSSION

The Antiterrorism and Effective Death Penalty Act ("AEDPA") establishes a one-year statute of limitations that applies to a petition for a writ of habeas corpus filed "by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2244(d)(1). The limitations period commences when the judgment becomes final "by the conclusion of direct review or the expiration of the time for seeking such review[.]" 28 U.S.C. § 2244(d)(1)(A). The period of direct review includes the ninety-day period within which a petitioner can petition for writ of certiorari with the United States Supreme Court, whether or not he files such a petition. *Bowen v. Roe*, 188 F.3d 1157, 1159 (9th Cir. 1999).

The limitations period is statutorily tolled during the pendency of a "a properly filed application for State post-conviction or other collateral review." 28 U.S.C. § 2244(d)(2). A properly filed application remains "pending as long as a state avenue for relief remains open, whether or not a petitioner takes advantage of it." *Melville v. Shinn*, 68 F.4th 1154, 1156 (9th Cir. 2023). The limitations period is not tolled, however, "from the time a final decision is issued on direct state appeal [to] the time the first state collateral challenge is filed." *Grant v. Swarthout*, 862 F.3d 914, 918 (9th Cir. 2017) (quoting *Roy v. Lampert*, 465 F.3d 964, 968 (9th Cir. 2006)).

Petitioner's convictions became final when the ninety-day period to petition the U.S. Supreme Court for certiorari expired on May 2, 2018. Petitioner then filed his PCR petition on October 15, 2020. However, the PCR court ultimately dismissed Petitioner's PCR petition as

untimely under Oregon's two-year statute of limitations, and therefore it was not "properly filed" for the purposes of tolling AEDPA's statute of limitations. *See Pace v. DiGuglielmo*, 544 U.S. 408, 410 (2005) (holding that a state PCR petition rejected as untimely was not "properly filed" within the meaning of 28 U.S.C. § 2242(d)(2)). Petitioner then signed his federal habeas petition on December 27, 2024.

Between May 2, 2018—when Petitioner's convictions became final upon conclusion of direct review—and December 27, 2024—when Petitioner signed his federal habeas petition and delivered it to prison officials for mailing—2,431 days accrued. Because the 2,431 days that elapsed before Petitioner filed for federal habeas relief far exceed the 365 days permitted by AEDPA, the petition is untimely.

Petitioner does not deny that his federal habeas petition is time-barred. Instead, he seeks to establish a colorable claim of actual innocence to overcome the untimeliness.[3] In this context, a colorable claim of actual innocence is not itself a basis for relief, but rather "serves as a gateway through which a petitioner may pass" for a habeas court to consider constitutional claims that are procedurally barred. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). This is an

[3] Petitioner indicated in his *pro se* supporting brief that he intended to assert an actual innocence claim but his arguments and supporting evidence were unclear. (ECF No. 13.) This Court thus appointed the Federal Public Defender ("FPD") for the limited purpose of evaluating Petitioner's actual innocence claim and determining whether there was sufficient evidence to warrant an evidentiary hearing. (ECF No. 15.) The FPD ultimately filed a supplemental supporting brief clarifying Petitioner's actual innocence claim. (Br. Supp. Pet'r's Schlup Claim ("Pet'r's Supp. Br."), ECF No. 25.)

exacting standard that is satisfied only in the "extraordinary case." *House v. Bell*, 547 U.S. 518, 538 (2006) (simplified); *see also McQuiggin*, 569 U.S. at 386 (cautioning that "tenable actual-innocence gateway pleas are rare" (citing *Schlup*, 513 U.S. at 329)).

To establish a gateway actual innocence claim, Petitioner must "present[] evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Schlup*, 513 U.S. at 316. Petitioner must support his actual innocence claim with "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324.

Petitioner presents in support of his actual innocence claim the declaration of Mendoza-Espinoza, dated March 10, 2026. (Pet'r's Supp. Br., Ex. 1.) In her declaration, Mendoza-Espinoza attests that her family kept their distance from the victims' family after a cousin accused the victims' brother of sexual abuse in 2006. (*Id.* ¶¶ 2-3.) Mendoza-Espinoza states that her family "eventually . . . began spending time with [the victims' family] again" but "[t]he tension from the 2006 incident was always present." (*Id.* ¶ 3.) Mendoza-Espinoza further attests that a few months before YR's disclosure, YR's mother asked Petitioner to install motion sensor lights outside YR's bedroom window because she heard noises coming from their backyard and suspected YR was having a relationship with an adult man. (*Id.* ¶¶ 4-5.) Mendoza-Espinoza attests that after Petitioner installed the lights, YR was "distant" and would get upset with Petitioner "over small things." (*Id.* ¶ 10.) Petitioner argues that this "new" evidence is sufficient to make a gateway showing of actual innocence because it "shows that the alleged victims . . . had a motive to fabricate their accusations[.]" (Pet'r's Supp. Br. at 17.)

Petitioner's evidence is insufficient to make a gateway showing of actual innocence. As an initial matter, at least some of the evidence presented here is not new. As Respondent points out, several family members, including ER, testified that there had been a rift in the family in 2006 due to sexual abuse allegations that did not involve Petitioner. (*See* Resp't Ex. 107 at 167, ER's testimony that the families had "split" in 2006, and that "everything changed when they decided to accuse my brother"; *see also* Resp't Ex. 108 at 46-47, discussing a "falling out" that occurred in 2006 due to sexual abuse allegations that had "[a]bsolutely nothing" to do with Petitioner; *id.* at 53, acknowledging "everybody stopped talking to each other" in 2006; *id.* at 66, acknowledging a "big rift" in the family in 2006 that was unrelated to Petitioner; *id.* at 73, explaining that sexual abuse allegations that did not involve Petitioner were "the starting division of the family" in 2006.)

Furthermore, evidence supporting an actual innocence claim must be new *and* reliable. Petitioner's new evidence consists only of his wife's declaration. The Ninth Circuit has confirmed that "[d]eclarations are not a strong form of evidence because 'the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations.'" *Garcia v. Evans*, 670 F. App'x 622, 623 (9th Cir. 2016) (quoting *Herrera v. Collins*, 506 U.S. 390, 417 (1993)); *see also Cotton v. Schriro*, 360 F. App'x 779, 780 (9th Cir. 2009) (stating that affidavits obtained after trial without the benefit of cross-examination should be "treated with a fair degree of skepticism" (quoting *Herrera*, 506 U.S. at 423)). The reliability of the declaration is further undermined by Mendoza-Espinoza's familial ties with Petitioner. *See Jones v. Taylor*, 763 F.3d 1242, 1249 (9th Cir. 2014) (explaining that evidence of actual innocence provided by family members "reduces their weight and reliability"); *see also House v.*

*Bell*, 547 U.S. 518, 551 (2006) (noting that testimony by friends or relations of the accused may have less probative value than that of disinterested witnesses).

Even if this Court set aside its reservations about the reliability of Mendoza-Espinoza's declaration, however, the evidence presented here at most might show that some doubt may exist in this case. That is not enough. *See Downs v. Hoyt*, 232 F.3d 1031, 1040 (9th Cir. 2000) (noting that "[i]t is not enough that the evidence [submitted in support of an actual innocence claim] shows the existence of a reasonable doubt" (citing *Schlup*, 513 U.S. at 329)); *see also Lorensten v. Hood*, 223 F.3d 950, 954 (9th Cir. 2000) (explaining that a petitioner must demonstrate actual innocence "by a preponderance of the evidence, and he must show not just that the evidence against him was weak, but that it was so weak that 'no reasonable juror' would have convicted") (simplified). This Court therefore concludes that the proffered evidence, when considered with the evidence presented at trial, is not such that no reasonable juror would have found Petitioner guilty beyond a reasonable doubt. *Schlup*, 513 U.S. at 329. Petitioner therefore has not established a gateway claim of actual innocence to warrant review of his untimely claims.[4]

///

///

///

///

///

///

///

---

[4] Because the petition is untimely without excuse, this Court does not reach Respondent's alternative argument that Petitioner's ineffective assistance claim is procedurally defaulted.

## CONCLUSION

For the reasons stated, this Court DENIES the Petition for Writ of Habeas Corpus (ECF No. 2), and DISMISSES this proceeding, with prejudice. Petitioner has not made a substantial showing of the denial of a constitutional right, and therefore this Court DENIES a Certificate of Appealability. *See* 28 U.S.C. § 2253(c)(2).

**IT IS SO ORDERED.**

DATED this 1st day of November, 2026.

/s/ Karin J. Immergut

Karin J. Immergut
United States District Judge